**John B. WILSON et al., Appellees and Cross-Appellants,**

**v.**

**IOWA CITY, Iowa, William B. Hubbard, W. Burger, et al., Appellants and Cross-Appellees.**

**No. 53300.**

Supreme Court of Iowa.

March 11, 1969.

William L. Mearden and Jay H. Honohan, Iowa City, for appellants.

Bartley, Bartley, Diehl, Thornton & Light, Iowa City, for appellees.

LeGRAND, Justice.

This is an action for declaratory judgment brought by residents of Iowa City, Iowa, challenging the validity of certain proceedings under chapter 403, Code of Iowa, commonly called the Urban Renewal Law.

It was brought and tried as an equitable action, and our consideration on this appeal is de novo. Rule 334, Rules of Civil

Procedure; Frederick v. Shorman, 259 Iowa 1050, 1055, 147 N.W.2d 478, 482.

Chapter 403 was originally enacted in 1957. It declares there exist in the municipalities of this state certain areas which "constitute a serious and growing menace, injurious to the public health, safety, morals and welfare." Its announced purpose, as set forth in section 403.2, includes the prevention, elimination, and rehabilitation of these "slum and blighted areas" in order that the state and its municipalities "shall not continue to be endangered by areas which are focal centers of disease, promote juvenile delinquency and consume an excessive portion of state revenues because of the extra services required for police, fire, accident, hospitalization and other forms of public protection, services and facilities."

Iowa City, a municipality with a council-manager form of government under chapter 363C, Code of Iowa, first availed itself of the urban renewal law in 1964. From 1964 to 1967, when this action was started, the council adopted numerous resolutions designed ultimately to put an urban renewal project into effect.

This controversy covers a period of more than three years. During that three-year period the makeup of the city council, composed of five members, was changed several times. From September 21, 1964, to January 1, 1966, the councilmen were Yocum, Maas, Burger, Hubbard and Nesmith. From January 1, 1966, to January 1, 1968, the list included Hubbard, Burger, Nesmith, Lind and Hickerson. From January 2, 1968, to the time of trial, Lind, Hickerson, Connell, Butherus and Brandt served on the council.

The council first took action under chapter 403 on September 21, 1964, when it passed a resolution of necessity finding that "one or more slums or blighted areas exist in the city of Iowa City, Iowa, and the rehabilitation, conservation, redevelopment or a combination thereof of such area or areas is necessary in the interest of the public health, safety, morals or welfare of the residents of the city of Iowa City, Iowa."

This resolution was obviously adopted to comply with the requirements of section 403.4, Code of Iowa. Its language is identical with the statute and its passage is a condition precedent to the exercise of urban renewal authority by a municipality.

On the same date a second resolution was passed directing the city manager's office to arrange for the preparation of an application to the proper agency of the federal government, the first step under Title I, Housing Act of 1949, (42 U.S.C.A. section 1450 et seq.) to secure financial assistance for an urban renewal program.

Neither of these resolutions did more than find the city had certain slum or blighted areas and determine it was advisable to attempt rehabilitation under the urban renewal law. They neither described nor located such areas.

The record sets out numerous activities on the part of the council and many resolutions dealing with surveys, plans, legal services, engineering services, and appraisals, but we refer only to those matters which are relied upon by the litigants in their presentation of this appeal. Issues not urged are deemed waived under our rules. Rule 344(a) (3) (4, Third), R.C.P.; Sawyer v. Sawyer, 261 Iowa 112, 152 N.W.2d 605, 610; Nelson v. Leaders, 258 Iowa 919, 923, 140 N.W.2d 921, 923, 924; B–W Acceptance Corp. v. Saluri, 258 Iowa 489, 499, 139 N.W.2d 399, 404; Allerton-Clio-Lineville Community School District v. County Board of Education, 258 Iowa 846, 848, 140 N.W.2d 722, 723, and citations.

On August 15, 1967, the council by resolution set a public hearing for the City-University Urban Renewal Project R–14. The hearing date was September 12, 1967. Prior to the hearing plaintiffs secured a temporary injunction enjoining defendants Hubbard, Burger, Hickerson and Lind from "participating in any manner in any action

of the defendant, City of Iowa City, Iowa, or any board or commission thereof or urban renewal agency" concerning property then under consideration for urban renewal treatment.

No hearing was held. Later, after trial, a decree was entered finding certain resolutions adopted by the council on March 7, 1967, invalid and void under section 403.16, Code of Iowa; holding all other proceedings pertaining to urban renewal up to and including August 15, 1967, valid; and holding councilmen Lind, Hickerson, Hubbard, and Connell "prohibited by section 403.16 from participating in a vote on the proposed project Iowa R–14 set for hearing by resolution enacted on August 15, 1967."

Other findings and holdings of the trial court are referred to in detail later.

Both plaintiffs and defendants have appealed, urging specific propositions which they claim require reversal of the district court decree. To some extent these propositions overlap. In those instances we discuss the assertions of both sides in one division for brevity and clarity.

As is perhaps already apparent, the fundamental dispute here—and the point upon which the result must hinge—is whether certain members of the city council were prohibited from voting on urban renewal resolutions because of conflict of interest. This, in turn, depends upon the construction given to section 403.16, which provides, in part, as follows:

"No public official or employee of a municipality, or board or commission thereof, and no commissioner or employee of an urban renewal agency, * * * shall voluntarily acquire any personal interest, direct or indirect, in any urban renewal project, or in any property included or planned to be included in any urban renewal project of such municipality, or in any contract or proposed contract in connection with such urban renewal project. Where such acquisition is not voluntary, the interest acquired shall be immediately disclosed in writing to the local governing body, and such disclosure shall be entered upon the minutes of the governing body. If any such official, commissioner or employee presently owns or controls, or has owned or controlled within the preceding two years, any interest, direct or indirect, in any property which he knows is included or planned to be included in an urban renewal project, he shall immediately disclose this fact in writing to the local governing body, and such disclosure shall be entered upon the minutes of the governing body; and any such official, commissioner or employee shall not participate in any action by the municipality, or board or commission thereof, or urban renewal agency affecting such property. * * Any violation of the provisions of this section shall constitute misconduct in office."

With this statute as background, we discuss the factual situation leading up to the resolutions of March 7, 1967, which the trial court held to be invalid. We eliminate those proceedings which are unimportant to this appeal.

As previously mentioned the city council adopted a resolution of necessity on September 21, 1964. On November 17, 1964, a resolution was passed asking for a federal grant of $171,969.00 to undertake and carry out an urban renewal project in Iowa City. The resolution specifically described the area to which these funds were applicable. Part of this area is included in the City-University Urban Renewal Project R–14.

This proposed project was the subject of one of the two resolutions of March 7, 1967, and was also the plan upon which the enjoined public hearing was to have been held.

On July 13, 1965, and April 5, 1966, resolutions were adopted asking additional funds from the federal government to make surveys and prepare plans on other specifically described areas. These remain part of the city's comprehensive program, but are still in the study stage.

On October 26, 1965, new property was added to the area upon which the city has

announced urban renewal plans. This property is part of Iowa R–31, the proposed project covered by the second resolution of March 7, 1967.

We call attention to the fact that each of the four resolutions adopted prior to March 7, 1967, described property upon which an urban renewal project was contemplated. Substantial funds were requested to make studies and surveys and to employ legal, engineering, and other personnel for this purpose.

Each of the two resolutions of March 7, 1967, was entitled "Resolution Authorizing the Filing of an Application for Loan and Grant."

They were actually alternative resolutions. One encompassed part, but not all, of the property covered by the November 17, 1964, resolution. The other included the remainder of the property described in that resolution plus the area added by the resolution of October 25, 1965.

Originally it was contemplated all this should comprise one project. It was split, however, when there was a cutback on available financing. To come within the new funding limitations, the larger project was divided into two smaller ones. Only one, Iowa R–14, had been set for public hearing when the temporary injunction issued.

This becomes important later in considering the validity of Councilman Lind's vote.

The trial court found the vote by which the resolutions of March 7, 1967, were adopted invalid for these reasons:

"The importance of the two resolutions enacted March 7, 1967, is the establishment as the date that a councilman would then know whether or not he owned property planned to be included in an urban renewal project, and further that all through the resolutions they referred to proposed projects and in fact they were projects at that time when they were voted upon. * * * [The vote] is * * * invalid because Hubbard, Lind and Hickerson were prohibited from voting on the said resolutions [under section 403.16]."

Both sides appeal from this part of the decree, defendants insisting no urban renewal project was adopted by the resolution of March 7, 1967, while plaintiffs assert the date upon which a disqualifying interest first occurred was November 17, 1964, and that the resolutions of that date as well as those of July 13, 1965, October 26, 1965, and April 5, 1966, should have been declared invalid.

I. Before considering these conflicting claims involving an interpretation of section 403.16, there is one proposition which runs all through this appeal and which we should first dispose of. It is defendants' contention the trial court was wrong in holding a vote cast in violation of section 403.16 invalidates the proceeding even though that vote was not decisive to the outcome. Defendants claim such a vote may constitute misconduct on the part of the officer but does not vitiate the action of the council unless the measure would have failed without it.

We have never squarely ruled on this. We have held in several cases a vote contrary to a conflict of interest rule is void, but in each case the vote was necessary to the passage of the resolution. Buffington Wheel Company v. Burnham, 60 Iowa 493, 496, 15 N.W. 282, 284; Bay v. Davidson, 133 Iowa 688, 690, 111 N.W. 25, 9 L.R.A., N.S., 1014; James v. City of Hamburg, 174 Iowa 301, 309, 156 N.W. 394; Krueger v. Ramsey, 188 Iowa 861, 866, 176 N.W. 1, 3; Town of Hartley v. Floete Lumber Company, 185 Iowa 861, 865, 171 N.W. 183.

We do not cite these cases for any analogy to our present facts but only to show the anxiety of courts, both at common law and under statute, to dishonor contracts or other actions by a city council when one of its members is in line to gain personal profit thereby.

In Bay v. Davidson, supra, at page 691 of the Iowa Reports, at page 26 of 111 N. W., we quoted this with approval, "It is a well-established and salutary rule in equity that he who is intrusted with the business of others cannot be allowed to make such business an object of pecuniary profit to himself. This rule does not depend upon reason technical in character, and is not local in its application. It is based upon principles of reason, of morality and of public policy. It has its foundation in the very constitution of our nature, for it has authoritatively been declared that a man cannot serve two masters, and is recognized and enforced wherever a well-regulated system of jurisprudence prevails. * * *"

And in the Hamburg case, where it was found a member's public duty ran afoul of his private interest, we said at page 309 of the Iowa Reports, at page 396 of 156 N.W., "He was called upon to serve two masters; one with which his interest financially was bound up, the other, in which was involved his public duty as an officer of the city. He was bound therefore to serve both faithfully—the bank of which he was an officer and in which he was financially interested, and the city of which he was also an officer and servant. It is an old saying that a man cannot serve two masters, * * *. A temptation would be offered * * * to disregard his public duty, and yield to the temptation of personal interest. It is this that the law guards against. It is this sort of a condition that the law is intended to avoid. * * * The law intends that these public officers should, like Caeser's wife, be above suspicion and temptation."

And, again at 312, at 397 of 156 N.W., "Some men are big enough and strong enough to waive all personal considerations and discharge fairly and impartially a public duty, but all men are not so constituted. The law would remove from public officers these temptations to which, owing to the weakness of human nature, men do sometimes yield."

In the Krueger case, we set aside the action of a city council in vacating a street where it appeared one of the councilmen had an "understanding" by which he was later to acquire that property.

In all these cases the challenged vote was necessary to secure a majority. None is authority for the problem confronting us here; nor are the courts of other jurisdictions in general accord. There is authority for either side. We agree with the trial court the better rule holds a vote cast in violation of a conflict of interest statute, even if immaterial to the outcome, vitiates the proceeding.

In Baker v. Marley, 8 N.Y.2d 365, 208 N.Y.S.2d 449, 450, 170 N.E.2d 900, 901, concerning such a situation the court said this, "Public policy forbids the sustaining of municipal action founded upon the vote of a member of the municipal governing body in any matter before it which directly or immediately affects him individually."

This same result was reached in Aldom v. Borough of Roseland, 42 N.J.Super. 495, 127 A.2d 190, 193, 197; Pyatt v. Mayor & Council of Borough of Dunellen, 9 N.J. 548, 89 A.2d 1, 5; Piggott v. Borough of Hopewell, 22 N.J.Super. 106, 91 A.2d 667, 670.

The opposite result was reached in Singewald v. Minneapolis Gas Company, 274 Minn. 556, 142 N.W.2d 739, which held a vote violative of a conflict of interest rule invalidates the result only when that vote is decisive in the passage of the act. In Marshall v. Ellwood City Borough, 189 Pa. 348, 41 A. 994, 995, and Eways v. Reading Parking Authority, 385 Pa. 592, 124 A.2d 92, 93, the Pennsylvania court also adheres to the rule that an improper vote does not void the result unless that vote is decisive in it. See 62 C.J.S. Municipal Corporations § 402, page 761.

A strong and persuasive statement of the rule we favor is found in Piggott v. Borough of Hopewell, supra, 91 A.2d, at page 670, where it is said in quoting from earlier New Jersey decisions, "The concurrence of an interested member in the action taken by the body taints it with illegality.

* * * The infection of the concurrence of the interested person spreads, so that the action of the whole body is voidable. * * This is the general rule. * * * It is supported by a twofold reason, viz.: First, the participation of the disqualified member in the discussion may have influenced the opinion of the other members; and, secondly, such participation may cast suspicion on the impartiality of the decision. * * * It being impossible to determine whether the virus of self-interest affected the result, it must needs be assumed that it dominated the body's deliberations, and that the judgment was its product."

We hold a vote by a member of the council on any of the challenged resolutions, if in violation of section 403.16, is void and that the result reached by the council in such a matter is also void, whether such vote determined the issue before the council or not.

II. Returning now to the question of whether the vote of any councilman was contrary to the provisions of section 403.16, we find the trial court held the resolutions of March 7, 1967, void because they were voted on by councilmen after they knew property owned by them or in which they had an interest was included in the urban renewal project. The trial court further found March 7, 1967, was the date upon which a project as defined in section 403.17, Code, was born.

We agree these two resolutions of March 7, 1967, were void but we do not agree that there must first be a project before a councilman becomes disqualified under section 403.16. The statute plainly intended to disqualify an interested member before that time. We refer to the wording of the statute that no public official or employee shall voluntarily acquire any personal interest, direct or indirect, in any urban renewal project, or in any property included or *planned to be included therein,* or in any contract *or proposed contract* in connection therewith. Later it is provided a councilman must disclose any interest, direct or indirect, which he owned or controlled in the past two years or which he now owns or controls, in any property which he knows is included or *planned to be included* in an urban renewal project. This section then bars his participation in any action by the municipality "affecting such property."

We cannot escape the conclusion the legislature intended every public official and employee described in the statute to be prevented not only from gaining personal advantage after he actually knew what was included in a project, but to prevent him also from trading upon advance information as to what was planned to be included therein.

In the present case it can hardly be denied the councilmen knew what property was planned for the project when the resolutions of November 17, 1964, July 13, 1965, October 26, 1965, and April 5, 1966, were adopted. All of those designated specified areas upon which urban renewal projects were then contemplated. That was the very reason for the resolutions—to certify to the federal agency the exact property on which studies, surveys and other necessary work was to be done and to request substantial funds for that purpose. We hold the date of each such resolution was the date upon which a member's disqualifying interest therein became fixed.

We further find that each of the four resolutions was void. As to the resolution of November 17, 1964, Councilmen Yocum and Hubbard both owned property within the described area. As to the resolution of July 13, 1965, Councilmen Yocum, Hubbard and Burger all owned property therein. As to the resolution of October 26, 1965, the same votes which disqualified the resolution of November 17, 1964, apply because that resolution simply extended the area to be included therein. In addition to that Councilman Maas owned a disqualifying stock interest in a corporation owning property within the added territory; and

as to the resolution of April 5, 1966, the votes of Councilmen Hubbard and Burger (Yocum no longer being on the council) were disqualified because that resolution merely extended the area to be included in the proposed project covered by the resolution of July 13, 1965.

Perhaps in view of these holdings it would be unnecessary to consider the effect of the vote on the resolutions of March 7, 1967, since those resolutions were based on the existence of proposed projects we have now held void. However, we have nevertheless given this matter our attention, and we agree with the trial court that the two resolutions passed on that date were void because Councilmen Lind, Hickerson and Hubbard all had a disqualifying interest under section 403.16 which prevented each from casting a valid vote.

The situation with regard to Mr. Hubbard is simple. He owned property in the area, and from what has already been said it is clear he should not have voted. However, the facts concerning Councilman Lind and Councilman Hickerson require special discussion.

III. Mr. Lind became a councilman on January 1, 1966. He did not vote on any resolution fixing the boundaries of proposed urban renewal projects until the council considered the resolution of April 5, 1966. This resolution did not directly affect him.

Mr. Lind had a leasehold interest in business property included in the area covered by the resolution of November 17, 1964. This is the area which was split into two sections because of reduced federal financing. Although he was not a member of the council when this area was originally established, he voted on the resolutions of March 7, 1967, the effect of which was to take the property in which he had an interest out of Iowa Project R-14 (the original large project) and place it in Iowa Project R-31 (an alternative smaller project.)

The trial court properly held such a vote was in violation of section 403.16. Defendants claim this vote was permissible. They say any other result would void all urban renewal because one's property is always either within a proposed area or is beyond it. It must of necessity be one or the other. Therefore, defendants argue, urban renewal would be impossible. This argument, while ingenious, is without merit. It overlooks the real significance of the votes of March 7, 1967. At that time Mr. Lind's leased property was already in the proposed project. Therefore his interest had attached to it. When the vote was made to split the project into two sections, it necessarily changed the status of his interest. He was then voting to take his leased property out of one proposed project and put it into another proposed project. It is evident that one may be just as affected, either beneficially or adversely, by having his property deleted from a project as by having it included in the first place. We agree with the trial court that Councilman Lind was disqualified from voting on the resolutions of March 7, 1967 for this reason.

IV. Councilman Hickerson's situation is quite different. His disqualification is based entirely upon his employment by the University of Iowa, which owned real estate in the area and was vitally interested in the project. University officials had publicly urged the city to proceed with urban renewal. The University was to have exclusive right to purchase some of the land after the city acquired it by condemnation. Mr. Hickerson had held various positions of responsibility and trust with the University. At the time he became a member of the council he was director of the alumni office. Soon after his election he was made director of community relations for the University, a newly created position. We believe the record fairly shows no one was more openly in favor of the urban renewal plans than the University nor would anyone be more beneficially affected by them. While this is understandable and

perhaps even desirable, it nevertheless posed serious problems for Mr. Hickerson, who is now the mayor.

Defendants insist he is not in violation of section 403.16 because that statute disqualifies a councilman only if he owns or controls an interest, either direct or indirect, in property within the project. Mr. Hickerson has no such property interests, except some stock holdings which we discuss later.

There might be some merit to this argument if we were to limit ourselves to the literal language of this section alone, but to do so would go contrary to the obvious purpose of the law and to the intent of the legislature in adopting it.

This provision has not heretofore been before us for interpretation. Under these circumstances we are obliged to examine both the language used and the purpose for which the legislation was enacted. Dingman v. City of Council Bluffs, 249 Iowa 1121, 1126, 90 N.W.2d 742, 746 and citations.

Furthermore we must consider all parts together and not give undue importance to any single or isolated portion. In Bowman v. City of Davenport, 243 Iowa 1135, 1144, 53 N.W.2d 249, 254, 63 A.L.R. 2d 853, we said, "All parts [of the statute] must be considered. It is fundamental in the construction of statutes that the ultimate object is to determine the real purpose and meaning."

In Ritter v. Dagel, Iowa, 156 N.W. 2d 318, 321, we approve his statement from Bruce v. Wookey, 261 Iowa 231, 154 N.W.2d 93, 94, "Each section must be construed with the act as a whole and all parts of the act considered, compared and construed together." We point out, too, it is not permissible to rest the interpretation of a legislative act upon any one part or to give undue effect thereto.

And at page 323 of the Ritter opinion we repeat the statement from 50 Am. Jur., Statutes, section 340, page 333, that a statute will not be presumed to overturn long-established legal principles, unless that intention is clearly expressed or the implication to that effect is inescapable. "To the contrary, the legislature will be presumed not to intend to overturn long-established principles of law, and the statute will be so construed, unless an intention to do so plainly appears by express declaration or necessary or unmistakable implication, and the language employed admits of no other reasonable construction. * * *"

We doubt if any rule of law has more longevity than that which condemns conflict between the public and private interests of governmental officials and employees nor any which has been more consistently and rigidly applied.

The high standards which the public requires of its servants were set by common law and adopted later by statute. It is almost universally held that such statutes are merely declaratory of the common law. 10 McQuillin, Municipal Corporations, section 29.99, page 483; Bay v. Davidson, 133 Iowa 688, 694, 111 N.W. 25, 27, 9 L.R.A.,N.S., 1014; James v. City of Hamburg, 174 Iowa 301, 313, 156 N.W. 394, 398; Krueger v. Ramsey, 188 Iowa 861, 868, 175 N.W. 1, 3; Stockton Plumbing & Supply Co. v. Wheeler, 68 Cal.App. 592, 229 P. 1020, 1022.

These rules, whether common law or statutory, are based on moral principles and public policy. They demand complete loyalty to the public and seek to avoid subjecting a public servant to the difficult, and often insoluble, task of deciding between public duty and private advantage.

It is not necessary that this advantage be a financial one. Neither is it required that there be a showing the official sought or gained such a result. It is the *potential* for conflict of interest which the law desires to avoid.

With this in mind, we find it difficult to believe, as defendants would have us do,

the legislature intended to scuttle all prohibition against conflict of interest in proceedings under chapter 403 except in those situations fitting the narrow interpretation we are asked to put upon section 403.16. We think rather that all signs point to the contrary.

Chapter 403 grants new and unusual powers to municipalities or to those exercising urban renewal authority under its delegation. It permits the use of eminent domain for hitherto unauthorized purposes. Sections 403.12 and 403.14 detail a list of permissible acts which are sweeping and drastic innovations.

In view of this we are not persuaded defendants' interpretation of section 403.16 is the correct one. A fair reading of the whole section, together with all other parts of the chapter, leads to the conclusion the legislative intent was to prohibit any personal interest on the part of public officials and employees in the whole project, not merely an interest in property included within the project.

How does this affect Mr. Hickerson's status? We agree with the trial court his was a disqualifying personal interest under the statute.

We do not say every University employee would be deprived of a voice in urban renewal proceedings by reason of such employment. Here, however, we have an employee in a position of influence as director of community relations, the very department with which the city would deal in case of matters of mutual interest to the University and the city. In addition we have unusual and direct interest on the part of the University in the outcome of urban renewal proceedings.

We are not critical of any of these circumstances except as they affect the possibility of conflict of interest between public duty and loyalty to a private employer.

The employer-employee relationship has always been recognized as one source of possible conflict of interest. It would perhaps be more accurate to describe this, as some writers have done, as a conflict of duties rather than conflict of interest. When one is committed to give loyalty and dedication of effort to both his public office and his private employer, when the interests of those two may conflict, one is faced with pressures and choices to which no public servant should be unnecessarily exposed. James v. City of Hamburg, supra; Town of Hartley v. Floete Lumber Co., 185 Iowa 861, 864, 865, 171 N.W. 183, 185.

We find the New Jersey case of Griggs v. Borough of Princeton, 33 N.J. 207, 162 A.2d 862, 869, almost identical with the one now before us. There the court held two officials of Princeton University were barred from voting on an urban renewal project in which the university had a substantial stake. The court said, "The question is whether there is a potential for conflict, not whether the public servant succumbs to the temptation or is even aware of it. * * * The potential of psychological influences cannot be ignored. * * [T]he mere existence of a conflict, and not its actual effect, requires the official action to be invalidated."

In another New Jersey case, it was said it is "most doubtful that participation by a councilman in a municipal action of particular benefit to his employer can be proper in any case." Pyatt v. Mayor & Council of Borough of Dunellen, 9 N.J. 548, 557, 89 A.2d 1, 5.

For the reasons stated we conclude Mr. Hickerson was barred from voting on the resolutions of March 7, 1967, because of conflict of interest.

In reaching this conclusion we state there is no evidence Mr. Hickerson was actuated by anything except his sincere convictions nor that his motives were in any way selfish or contrary to the welfare of the public. We can only repeat it is the *possibility* of such things which makes the rule applicable here. As bearing on this matter see 47

Virginia Law Review 1034, 1050; 107 Pa. Law Review 985; 58 Columbia Law Review 157; 2 Davis, Administrative Law Treatise, section 12.03, pages 155, 156.

V. We should mention several other matters briefly. Several councilmen held or controlled stock in corporations which owned or had leasehold interests in real estate within the proposed project area.

The trial court held such ownership was not a disqualifying one because in each case it was less than five percent of the outstanding stock of the corporation involved. In doing so the trial court apparently relied on section 368A.22, subd. 2 (i), Code of Iowa.

Plaintiffs allege this was error, and we agree. Section 403.16 provides any interest of the kind described therein shall prevent participation in proceedings affecting it. Section 403.18 provides that the provisions of chapter 403 shall control in case of inconsistency between its terms and the provisions of any other law.

We hold therefore section 403.16 making *any* interest sufficient to disqualify takes precedence over section 368A.22, subd. 2(i) holding such interest must represent at least five percent of the outstanding stock.

VI. Finally plaintiffs challenge the trial court's finding that ownership of property near, but not within, the proposed project does not come within the restrictions of section 403.16. We agree with the trial court.

This proposition affects the property of Councilman Butherus, who took office on January 1, 1968, and who has not participated in any urban renewal proceeding now before us. Plaintiffs ask a declaration of his status to determine his right to participate in future action under these circumstances.

Mr. Butherus is a contract purchaser of property within 200 feet of the boundary of the proposed project areas. Plaintiffs claim he has an interest in the project area because under section 414.5, Code of Iowa, he would be entitled to notice of, and to object to, any zoning changes affecting part of the project property; and further because under section 391.39, Code of Iowa, he could be assessed for some street improvements within the project area.

We find no merit to plaintiffs' contention. No reasonable interpretation of section 403.16 can lead to the result they ask for. The case of McNamara v. Borough of Saddle River, 64 N.J.Super. 426, 166 A.2d 391, is a zoning case and lends no support to plaintiffs' theory here.

VII. The record shows that Councilman Connell, who became a councilman on January 1, 1968, owns real estate in Project Iowa R–14. He was not a member of the council when any action here involved was taken. This opinion makes it clear, however, he cannot participate in any future action of the council concerning such project.

VIII. We have considered the claim of defendants that the vote on the two resolutions of March 7, 1967, did not constitute "participation" by the councilmen in any action "affecting" their property interests. We find no merit in this argument.

In fairness to all parties involved in this controversy we specifically approve the following findings made by the trial court: "There has been no evidence produced at any hearing of this cause indicating any dishonesty or improper motives or actions on the part of any councilmen, officers, or employees of the city of Iowa City, Iowa. However, actual dishonesty is not decisive. The fact that there is opportunity for dishonesty is what may disqualify. It is the potential for conflict of interest that becomes vital."

The decree entered by the district court is modified to provide that the resolutions passed by the city council on Novem-

ber 17, 1964, July 13, 1965, October 26, 1965, and April 5, 1966 in addition to the two resolutions of March 7 1967, are invalid and void. The decree is further modified to provide that ownership of any stock in a corporation which owns or holds an interest in property in an urban renewal project, or a proposed project, as defined in section 403.16, Code of Iowa, is a disqualifying interest under that section. In all other respects the district court decree is hereby affirmed.

Costs on appeal are taxed against defendant city of Iowa City.

Modified and affirmed on both appeals.

All Justices concur, except LARSON, J., who takes no part, GARFIELD, C. J., who dissents from Division IV, and STUART, J., who dissents from Division I.